## DISTILLERS FACTORS CORPORATION v. UNITED DISTILLERS PRODUCTS CORPORATION.

### Civ. No. 1978.

District Court, D. Connecticut.
Nov. 10, 1947.

Earl J. Wofsey, of Stamford, Conn., and Halle, Halle & Rowen, of New York City, for plaintiff.

Samuel Rosenthal, of Hartford, Conn., for defendant.

SMITH, District Judge.

This is a contract action based on the failure of the defendant to deliver upon demand 500 cases of bottled-in-bond, four-year-old bourbon whiskey at the price offered by the plaintiff, $37.97 per case. Plaintiff claims that this was the price at which defendant had agreed to resell the bottled whiskey to the plaintiff at the time of the sale of the whiskey in barrels to the defendant by the plaintiff.

The controversy arises out of the situation existing in the wholesale liquor business when under Office of Price Administration price control and just subsequent to the termination of the controls. Bonded whiskey in bulk, bottles, barrels, and bottled whiskey were all in short supply. Ceiling prices were lower than the prices which could have been obtained in a free market. As a result, it was customary for wholesalers, when selling bottled whiskey, to require a sale to them of an equivalent amount of whiskey in bulk, or to exact illegal over-ceiling prices.

Plaintiff was able to obtain a supply of whiskey in bulk at bulk ceiling prices by furnishing empty barrels, of which it had available a supply through a contract with a cooperage concern. In exchange for the empty barrels at ceiling, it obtained from distillers a supply of barreled whiskey at ceiling. In order to obtain the bottling of one lot of 112 barrels of bonded bourbon in the possession of the plaintiff, it entered into a contract with defendant under which it sold to the defendant the 112 barrels of whiskey at ceiling. Defendant bottled the whiskey in bottles furnished by the defendant and agreed to resell the bottled whiskey to the plaintiff.

The agreement, made while the ceilings were still on, contemplated resale at the then ceiling price for the particular brand and age of whiskey, $37.97 a case. This enabled the defendant to make a legal profit on the purchase of the barreled whiskey and sale of the bottled whiskey amounting to $2.97 a case, which was some $2 per case in excess of the ceiling price for furnishing bottles and cases and bottling the goods.

Defendant was unwilling to enter into a straight bottling contract because of the

scarcity of bottles and the small profit possible under the bottling ceiling. Plaintiff repurchased two lots of cases under the contract on the first of which, in order to save time, the parties mutually agreed to substitute whiskey from another lot in defendant's possession at a price of $41.99 a case, the ceiling price for whiskey of that particular lot.

A second order of 356 cases, bottled from the whiskey furnished by the plaintiff, was sold by defendant to plaintiff at $37.97 per case, leaving a balance of 500 cases from the whiskey furnished by the plaintiff, held by defendant for resale to the plaintiff under their agreement.

After shipment of the 356-case lot, Needleman, the president of the plaintiff corporation, Semel, who was president of the defendant, and two others were indicted in a United States District Court in Louisiana on charges of violation of the Emergency Price Control Act, 50 U.S.C.A. Appendix, § 901 et seq., in connection with the sale of the 356 cases by plaintiff to a person in Louisiana. Plaintiff and defendant refrained from any further action with regard to the remaining 500 cases, pending the outcome of the criminal trial, in order to avoid any question of illegality of the eventual sale of the goods.

The criminal trial terminated November 16, 1946, Semel being acquitted and the other three defendants convicted. Within one week thereafter, upon his return to New York, Needleman wrote to defendant, ordering the delivery of the remaining 500 cases. Needleman had also mentioned to Semel, during the intervening week, his desire to obtain delivery of the remainder of the whiskey. Semel refused to resell at the price of $37.97 a case but offered to sell to plaintiff, within a period of five days, at a price of $90 per case, the OPA ceilings having gone off in the meantime.

Defendant now claims that plaintiff's letter was not in accordance with the contract since it did not offer to pay the taxes. This is apparently an afterthought because there was no question raised by Semel at the time and he certainly must have understood that the plaintiff was offering to pay the $37.97 per case, including taxes, when the goods were removed from bond. Nor did he, at the time, raise any question as to plaintiff's ability to pay the full price in cash, which the plaintiff was well able to do. Plaintiff's offer to buy was genuine and so understood by the defendant who refused unless the price of $90 per case was paid.

The parties' recollections of what was said at the time of making the oral contract are entirely at variance. Of course, when the arrangement was made, the later possible lifting of the ceilings was not in contemplation and each, now, thinking back to the conversations, remembers them as so stated as to support the theory of the case which he adopted upon the lifting of the ceilings as most favorable to him. Probably each honestly believes what he wishes to believe but the surrounding circumstances make it much more probable that Needleman's recollection is correct. Certainly, at least up to the time of the trial in Louisiana, November, 1946, Semel considered that his part in the transaction was merely the conversion of the barreled whiskey into case goods for plaintiff at a profit of about $2 a case.

The transaction differs from the ordinary absolute sale in that, while it was contemplated that some of the attributes of ownership, such as duty to insure against loss by fire or take the risk of such loss, and paper title sufficient to satisfy the OPA, were to be in defendant, beneficial ownership, in other respects, including profit or loss on rise or fall of prices, remained in plaintiff. This would seem to follow, not only from Semel's testimony as to "ownership" at the trial in Louisiana but also from the entire surrounding circumstances, including the scarcity of the goods and the trade practice of declining to relinquish them at ceiling prices without some barter arrangement to insure either replacement of the goods in bulk form or some other scarce article necessary to the trade.

There is no element of illegality here but conditions prevailing in the trade are not to be ignored in determining what lay in the minds of the parties at the time of the agreement.

 We must find, then, that the agreement for resale was at the ceiling

price at the time the original sale was made, that is, $37.97 per case. Demand, of course, would have to be made for delivery on resale within a reasonable time after the bottled goods were produced. In ordinary circumstances, the wait until November 22, 1946 might have been more than a reasonable time. Here, both parties had good reason for tolling the running of the time during the pendency of the criminal proceedings in Louisiana and it is obvious from the failure of either party to make any move during that period with reference to the remaining 500 cases that both were agreeable to the wait, whether or not we credit Needleman's testimony as to Semel's specific request for the delay. Plaintiff acted promptly when the trial was over and, under all the circumstances, it must be held that demand was made within a reasonable time, and, in view of the failure to object to its form, that the demand was in proper form. The counter offer of defendant was, of course, a refusal of the demand and constituted a breach of the contract to resell. The measure of damages is the difference between the agreed resale price, $37.97 a case, and the market value of the bottled whiskey on the date of the refusal to resell.

The question of value is troublesome. We have evidence of the amount asked by defendant, $90 per case; of sales of comparable brands in the same period for amounts varying between about $50 and about $70 per case; and expert testimony placing the value anywhere from about $50 to about $90 per case. There was no market price at that time for the particular brand established by actual transactions in that brand. The brands of which sales were made were not sold on the open market but only from distillers to distributors chosen by the distillers in particular territories and upon allocations of short supplies by the distillers. However, I suppose that the distillers were not being entirely altruistic in setting their prices and that the price they charged their wholesale distributors would bear some relation to the price which would have obtained if a free market had existed.

Goldstein testifies to the price of 100-proof, bottled-in-bond rye in fifths in November, 1946 at $52.50 a case, equivalent to $65.63 in pints, as the 500 cases in ques-

tion were bottled. He admits that Kentucky bourbon would have been higher.

Lewis priced Kentucky bourbon in November, 1946 at $52.69 a case in fifths, equivalent to $65.86 in pints. This, however, was a controlled price of Schenley. On the open market the price would have been higher.

 $70 a case is a fair approximation of the market value from a consideration of all the evidence bearing upon the values.

Damages then amount to $32.03 per case, a total of $16,015.

Judgment may be entered for the plaintiff to recover of the defendant the sum of $16,015 and its costs.